# EXHIBIT A

Andrew A. Higgs, Esq. (SBN 221891)
ahiggs@lynberg.com
Ryan J. Anderson, Esq. (SBN 279471)
randerson@lynberg.com
**LYNBERG & WATKINS**
A Professional Corporation
1100 Town & Country Road, Suite 1450
Orange, CA 92868
Telephone: (714) 937-1010
Facsimile: (714) 937-1003

Attorneys for Defendants, HENKEL CORPORATION; and AMAZON.COM SERVICES LLC

## UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA – WESTERN DIVISION

| | |
|---|---|
| GABRIELLE WORTMAN, an individual,<br><br>Plaintiff,<br><br>vs.<br><br>AMAZON.COM SERVICES LLC; AMAZON.COM; HENKEL CORPORATION, a subsidiary of HENKEL AG & CO. KGaA; DOE SELLER; DOE DISTRIBUTOR; and DOES 1 to 100, inclusive,<br><br>Defendants. | CASE NO: 2:24-cv-06022 GW (AGRx)<br><br>[Assigned to District Judge, the Hon. George H. Wu George H. Wu, Courtroom 9D]<br><br>[Assigned to Magistrate Judge, the Hon. Alicia G. Rosenberg – Courtroom 550]<br><br>**DEFENDANTS' MOTION IN LIMINE NO. 2:**<br><br>**TO STRIKE OR LIMIT OPINIONS AND EXPERT TESTIMONY OF ZAL PHIROZ, PH.D.**<br><br>*[Concurrently filed herewith: [Proposed] Order Granting Defendant's Motion in Limine 1 and Declaration of Andrew A. Higgs]* |

**TO THE HONORABLE COURT, AND ALL PARTIES AND THEIR RESPECTIVE ATTORNEYS OF RECORD:**

Defendants HENKEL CORPORATION ("Henkel") and AMAZON.COM SERVICES LLC. ("Amazon") (hereinafter collectively "Defendants") hereby give notice that at 8:30 a.m., on December 4, 2025, in Courtroom 9D of the United States

1

District Court for the Central District of California, Western Division, Defendants will move this court in limine for an order that Plaintiff and Plaintiffs' counsel be precluded from referring to, or using any pleading, testimony, remarks, questions, or arguments which might inform the jury of any portion of Zal Phiroz, Ph.D.'s ("Dr. Phiroz") opinions or report, preclude Dr. Phiroz from testifying, and exclude Dr. Phiroz' expert report as to the matters addressed in this Motion. Defendants further seek the following orders:

(1)     That the parties and their counsel and witnesses be precluded from referring to the fact that this motion has been filed and/or granted; and

(2)     To warn and caution each of plaintiff's witnesses to strictly follow the same instructions.

This Motion is based on the fact that Dr. Phiroz' opinions do not meet the standard of admissibility for expert testimony and/or are not relevant to any of the issues being decided in this case and therefore are excludable. See Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993); Fed. R. Evid. 702, 401 and 403.

This motion is based on the attached supporting memorandum, the Declaration of Andrew A. Higgs, as well as on the pleadings, records, and papers already on file in this action, and all other such oral or documentary evidence as may be introduced at the time of the hearing of this motion.

DATED:  November 13, 2025

LYNBERG & WATKINS
A Professional Corporation

By: _____
ANDREW A. HIGGS
RYAN J. ANDERSON
Attorneys for Defendants
HENKEL CORPORATION and
AMAZON.COM SERVICES LLC

DEFENDANTS' MOTION IN LIMINE NO. 2 TO STRIKE OR LIMIT OPINIONS AND EXPERT TESTIMONY OF ZAL PHIROZ, PH.D.

## MEMORANDUM OF POINTS AND AUTHORITIES

## I.    INTRODUCTION

### A. Facts of The Case

Plaintiff Gabrielle Wortman ("Plaintiff") initiated this lawsuit in May 2024 against Defendants alleging toxic exposure to an EPA regulated pesticide. On the evening of October 6th, 2022, Plaintiff claims that she placed Defendant Henkel Corporation's product, Combat Max 12 Month Roach Killing Bait (hereinafter "Product") in her home, which she purchased from Defendant Amazon. Approximately two hours after placing the Product in her apartment, Plaintiff contends that she sustained an injury to her right eye after removing her right contact lens, which she attributes to her earlier use of the Product. No injury is alleged as to her left eye.

### B. Summary of Argument

Dr. Phiroz was retained by Plaintiff as a "supply chain practices" expert to perform the following tasks:

> "[A]nalyze the development and distribution of the Combat Max Roach Killing Bait Station product relative to accepted operations and supply chain industry practices at the manufacturing stage (including quality assurance, labeling, and safety testing), as well as at the retail stage." Higgs Declaration, Paragraph 3; **Exhibit A –** Expert Report of Zal Phiroz, page 3]

Dr. Phiroz's retention, however, is entirely unnecessary, First, Defendants anticipate that Plaintiff intends to have Dr. Phiroz offer opinions on whether Defendants allegedly breached an implied warranty, a duty or care, or voluntarily assumed a duty of care for the Subject Product.  These are all legal determinations that fall within the authority of this Court must determine, and are not subjects for expert testimony.

Second, Dr. Phiroz lacks the "knowledge, skill, experience, training, or education" required under Federal Rule of Evidence 702 to offer opinions on topics of product safety, toxicology, ophthalmology, or causation. His opinions are unsupported and will not "help the trier of fact to understand the evidence or determine a fact in issue." Fed. R. Evid. 702. He has no experience or training on such topics, and his expertise is limited to the field of "supply chain practices,"[1] which has absolutely no application to the present matter.

Under Daubert v. Merrell Dow Pharmaceuticals, Inc., 509 U.S. 579 (1993), and Federal Rule of Evidence 702, expert testimony must be grounded in reliable principles and applied reliably to the facts of the case. Moreover, they must be relevant to the subject matter. Rule 401. Dr. Phiroz' opinions fail these tests. Because his conclusions are neither methodologically sound nor relevant to the specific questions before the jury, they should be excluded in their entirety. Fed. R. Evid. 401, 403. Allowing Dr. Phiroz to opine on these issues would risk confusing the jury by presenting legal conclusions as expert evidence. His testimony on these matters should therefore be excluded.

## II.   LEGAL STANDARD

Federal Rules of Evidence 702 governs the admissibility of expert testimony. Federal Rules of Evidence 702 states:

> A witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if the proponent demonstrates to the court that it is more likely than not that:

/ / /

/ / /

/ / /

/ / /

---

[1] Dr. Phiroz defined "supply chain practices" as "an umbrella term that is used to describe relationships that exist from a supplier all the way to the consumption of a product."

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;

(b) the testimony is based on sufficient facts or data;

(c) the testimony is the product of reliable principles and methods; and

(d) the expert's opinion reflects a reliable application of the principles and methods to the facts of the case.

"In applying Rule 702, the Court functions as a gatekeeper, determining whether proffered expert testimony meets the requirements of Rule 702 by a preponderance of the evidence." In re Countrywide Fin. Corp. Mortgage-Backed Sec. Litig., 984 F.Supp.2d 1021, 1026 (C.D. Cal. 2013); (citing Daubert, *supra* 509 U.S. at 597). The offering party must show by a preponderance of the evidence, that (1) the expert is qualified to render the opinion; and (2) the opinion offered has adequate factual and scientific support for that opinion. Daubert, *supra* 509 U.S. at 592-93. Accordingly, in Daubert, *supra* 509 U.S. 579, the Supreme Court directed trial judges to exercise their "gatekeeping responsibility" to ensure that expert testimony be "not only relevant, but reliable." "The proponent of the witness bears the burden of establishing an expert's qualifications, reliability, and helpfulness." In Re REMEC Inc. Securities Litigation, 702 F.Supp.2d 1202, 1217 (S.D. Cal. 2010). "Rule 702 requires that expert testimony relate to scientific, technical, or other specialized knowledge, which does not include unsupported speculation and subjective beliefs." Guidroz-Brault v. Missouri Pacific R.R. Co., 254 F.3d 825, 829 (9th Cir. 2001)(emphasis added); see Daubert, 509 U.S. at 590.

Even if the standards are met under Daubert and Fed. R .Evid. 702, "[o]therwise admissible expert testimony may be excluded under Fed. R. Evid. 403 if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or undue delay." CFM Communications, LLC v. Mitts Telecasting Co., 424

F.Supp.2d 1229, 1236 (E.D. 2005) citing United States v. Hoac, 990 F.2d 1099, 1103 (9th Cir.1993); see also Fed. R. Evid. 401 and 403.

## III. DR. PHIROZ' OPINIONS MUST BE EXCLUDED

### A. Dr. Phiroz Offers Inadmissible Legal Conclusions

It would appear that Plaintiff intends to rely, in part, on Dr. Phiroz to establish that Defendants allegedly breached an implied warranty, a duty of care, and/or voluntarily assumed a duty of care for the Subject Product. All of these conclusions are questions of law that this Court must determine, not an expert.

California law establishes that implied warranties arise by operation of law. Specifically, the implied warranty of merchantability ensures that goods are fit for ordinary purposes, while the implied warranty of fitness for a particular purpose applies when a buyer relies on the seller's skill or judgment in selecting goods for a specific purpose. *See* In re ConAgra Foods, Inc., 90 F.Supp.3d 919 (2015). These warranties are governed by statutory provisions, including California Commercial Code §§ 2314 and 2315, and their application is determined by the court based on the facts and legal standards. In re ConAgra Foods, Inc., *supra* 90 F.Supp.3d 919. The Ninth Circuit has emphasized that courts, not expert witnesses, are responsible for interpreting and applying statutory provisions related to implied warranties. For example, in Sears, Roebuck & Co. v. Marhenke, the Ninth Circuit noted that the provisions of California law governing implied warranties required judicial interpretation, underscoring the court's role in resolving such legal questions. Sears, Roebuck & Co. v. Marhenke, 121 F.2d 598 (1941). Moreover, the First Circuit has further emphasized matters of law are inappropriate topics for expert testimony by pointing out "[a]t least seven circuit courts" have held that expert testimony on "applicable principles of law" is generally impermissible because "purely legal questions" are "exclusively the domain of the judge". Nieves-Villanueva v. Soto-Rivera, 133 F.3d 92, 99 (1st Cir. 1997); *citing* Aguilar v. International Longshoremen's Union, Local # 10, 966 F.2d 443, 447 (9th Cir.1992) (testimony of

purported expert that workers reasonably and foreseeably relied on defendants' promises addressed "matters of law for the court's determination" that were "inappropriate subjects for expert testimony").

In his expert report, Dr. Phiroz offered sweeping legal conclusions, including the following:

- "Henkel, as the manufacturer[,] is responsible for ensuring the subject product is safe for consumer use." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 4]
- "Amazon, as a retailer, is responsible for ensuring products listed on their platform meet safety and quality standards."[2] [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 8]

These opinions far exceed the proper scope of expert testimony and constitute improper and impermissible legal conclusions on ultimate issues of law in this case. The "responsibility" of a manufacturer and/or retainer goes to their legal duty owed to consumers. Whether Defendants owed implied warranties, owed a duty of care, or assumed a duty of care are purely legal questions that are "matters of law for the court's determination." Aguilar, *supra* 966 F.2d at 447.

It is important to note that at least one other court has already recognized that Dr. Phiroz's ultimate conclusions of law are not a proper topic for expert opinion. *See* Skaggs v. Amazon.com, Inc., 2020-1089 (La. App. 1 Cir. 12/15/21), 334 So. 3d 780, 788 (footnote 5), *writ denied*, 2022-00068 (La. 3/15/22), 333 So. 3d 1243. The Louisiana Court of Appeals explained, "after examining the affidavit of Dr. Phiroz, we find that his testimony consisted of legal opinions and conclusions of law. The ///

---

[2] Of note, what Dr. Phiroz fails to provide (as discussed in Section III(b)) are any reliable opinions based on the requisite "knowledge, skill, experience, training, or education" to support the product was unsafe. Thus, regardless of whether or not Defendants owed these asserted duties, they are irrelevant as he cannot opine on safety.

ultimate issue to be decided herein is whether Amazon is a seller under Louisiana law, which is the province of the trial court." Id.

It is clear that Dr. Phiroz's opinions regarding Defendant's supposed duties and responsibilities are inadmissible, and he should not be permitted to offer opinions on either of these issues.

**B. Dr. Phiroz Lacks Specialized Knowledge or Foundation to Offer Any Opinions on the Product, its Labeling, or its Active Ingredient Fipronil**

Dr. Phiroz claims to be an expert "in operations and global supply chain practices." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 3]. However, he has no knowledge, skill, experience, training, or education in the field of product safety, labeling, or chemistry. [Higgs Declaration, Paragraph 4; **Exhibit B** – Zal Phiroz CV]. Nevertheless, and despite having absolutely no basis to do so, Dr. Phiroz provided the following statements, conclusions, and opinions in his expert report:

- "There are several publicly accessible documents on the internet which specifically discuss the dangers and risks of Fipronil3, specifically noting the risk of eye irritation, and various tests which have been conducted on eye irritation." [Higgs Declaration, Paragraph #; **Exhibit A** – Expert Report of Zal Phiroz, page 6]

- "While Henkel Corporation ("Henkel") claims to have 'undergone extensive testing and toxicological studies', it appears the only testing for whether the product caused eye irritation or injury was undertaken by Clorox in 1995 and was conducted on rabbits. Notably, this study did not include any test specific to contact lenses." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 6]

/ / /

**6**

**MEMORANDUM OF POINTS AND AUTHORITIES**

- "The subject product contains 0.05% Fipronil and does not include a safety warning specific to eyes or contact lenses." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 7]

- "Other cockroach treatment products have different active ingredients (e.g. Imdacleprid, Imiprothin, Deltamethrin, etc.), and are sold on Amazon.com, demonstrating that it would be possible to make a cockroach bait which does not contain Fipronil." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 8]

- "Henkel may have been able to use an alternative active ingredient in manufacturing this product, which may not have contained an **unsafe chemical** such as Fipronil." [Higgs Declaration, Paragraph 3; **Exhibit A** – Expert Report of Zal Phiroz, page 8]

There is no foundation for Dr. Phiroz to provide expert testimony **any** issue specific to this case concerning the Subject Product or its safety. Dr. Phiroz's CV makes clear that he has **no** experience or training in product safety, labeling, or chemistry, including Fipronil.   [Higgs Declaration, Paragraph 4; **Exhibit B** – Zal Phiroz CV] In fact, Dr. Phiroz all buts admits this during his deposition, as he confirmed he did not have the requisite scientific, technical, or other specialized knowledge needed to make such statements or opinions:

Q. You don't have a medical license, correct?

A. I do not.

[Higgs Declaration, Paragraph 5; **Exhibit C** – Deposition of Zal Phiroz, Page 16, line 11 through line 12]

Q. Do you hold yourself out to be an expert in EPA approval of labels?

A. I do not.

**MEMORANDUM OF POINTS AND AUTHORITIES**

Higgs Declaration, Paragraph 5 **Exhibit C** – Deposition of Zal Phiroz, Page 47, line 9 through line 11]

Q. And you are not an accident reconstruction expert either, are you?

A. No.

[Higgs Declaration, Paragraph 5; **Exhibit C** – Deposition of Zal Phiroz, Page 61, line 25 through Page 62, line 2]

Q. You are opining that there should be more testing over the last 30 years because contact lenses have changed. But you're not an optometrist, correct?

A. Again, for the third time, correct.

Q. You're not an ophthalmologist, correct?

A. Do you want me to -- yes, correct.

Q. You are not an expert in EPA regulations, correct?

A. I am not.

Q. You are not an expert in human factors, correct?

A. Nor do I represent myself to be, no.

Q. You are not a chemist, correct?

A. Correct.

Q. You're not a toxicologist, correct?

A. Correct.

Q. You have not inspected the product, correct?

A. I have not needed to, correct.

Higgs Declaration, Paragraph 5; **Exhibit C** – Deposition of Zal Phiroz, Page 79, line 17 through Page 80, line 9]

Q. Prior to this case, had you heard of the active ingredient Fipronil?

A. No.

Higgs Declaration, Paragraph 5; **Exhibit C** – Deposition of Zal Phiroz, Page 73, line 25 through Page 74, line 2]

This case is about whether the Subject Product, which **Dr. Phiroz never**

**8**

**MEMORANDUM OF POINTS AND AUTHORITIES**

**inspected**, exposed Plaintiff to the chemical Fipronil, allegedly causing a corneal ulcer to Plaintiff's right eye. Dr. Phiroz admitted that he had never heard of Fipronil prior to this engagement and that he is not an expert in any of the relevant field that could address these issues. Despite this, Plaintiff seeks to present him as an "expert" in "supply chain practices," a subject that has no bearing on claims or defenses in this case. Any opinions from Dr. Phiroz relating to safety, labeling, or Fipronil would not be based on any scientific principles or reliable methodology. Instead, it would rest entirely on pure speculation rather than specialized knowledge or data. Testimony of this nature falls outside the scope of his expertise and therefore fails to satisfy the requirements of Rule 702.

Moreover, because Dr. Phiroz lacks the qualifications to address these issues, his testimony would have no probative value. Allowing him to testify on these topics would create a substantial risk of unfair prejudice and confusion, as the jury could mistakenly attribute scientific credibility to unsupported assumptions. This risk warrants exclusion under Federal Rule of Evidence 403.

Accordingly, the Court should exclude any opinions from Dr. Phiroz, as he has no specialized knowledge regarding product safety, labeling, or the chemical Fipronil, and he has not articulated how his *general* supply chain expertise is applicable to those issues.

## IV. IN THE ALTERNATIVE, DEFENDANTS REQUESTS A HEARING PURSUANT TO RULE 104 OF THE FEDERAL RULES OF EVIDENCE ON THE ADMISSIBILITY OF THE EVIDENCE

Federal Rule of Evidence 104 allows the court to hear and determine the admissibility of evidence out of the presence or hearing of the jury and rule on this fact when the existence of a preliminary fact is disputed and justice so requires. Defendants request such a hearing by this motion.

/ / /

/ / /

## V.    CONCLUSION

For the reasons stated above, Defendant respectfully requests that the Court preclude Plaintiff and Plaintiffs' counsel from referring to, or using any pleading, testimony, remarks, questions, or arguments which might inform the jury of any portion of Zal Phiroz, Ph.D.'s ("Dr. Phiroz") opinions or report, preclude Dr. Phiroz from testifying, and exclude Dr. Phiroz' expert report as to the matters addressed in this Motion. Defendants further move this Court to instruct all parties and their counsel:

1.    That the parties and their counsel and witnesses be precluded from referring to the fact that this motion has been filed and/or granted; and

2.    To warn and caution each of plaintiff's witnesses to strictly follow the same instructions.

DATED:  November 13, 2025

LYNBERG & WATKINS
A Professional Corporation

By: _____
ANDREW A. HIGGS
RYAN J. ANDERSON
Attorneys for Defendants

## <u>DECLARATION OF ANDREW A. HIGGS</u>

I, Andrew A. Higgs, do state and declare as follows:

1.     I am an attorney at law duly licensed to practice before all the courts of the State of California, and am a partner in the law firm of Lynberg & Watkins, A.P.C., attorneys of record for Defendants, HENKEL CORPORATION; and AMAZON.COM SERVICES LLC in the above-captioned matter.

2.     I have personal knowledge of the facts stated herein, except those stated upon information and belief, and as to those matters, I believe them to be true. If called upon to testify to the matters herein, I could and would competently do so. This Declaration is made in support of Defendants, HENKEL CORPORATION; and AMAZON.COM SERVICES LLC ("Defendants") Motion in Limine No. 2. To Strike or Limit Opinions and Expert Testimony of Zal Phiroz.

3.     Attached hereto as **Exhibit "A"** is a true and correct copy of Dr. Zal Phiroz' Expert Report.

4.     Attached hereto as **Exhibit "B"** is a true and correct copy of Dr. Zal Phiroz' Curriculum Vitae.

5.     Attached hereto as **Exhibit "C"** is a true and correct copy of relevant portions of the deposition transcript from the deposition of Dr. Zal Phiroz taken October 14, 2025.

I declare under penalty of perjury under the law of the United States of America that the foregoing is true and correct.

Executed this 13th day of November, 2025, in Orange, California.

_____
**ANDREW A. HIGGS, Declarant**

1
**DECLARATION OF ANDREW A. HIGGS**

# **EXHIBIT A**

**Zal Phiroz PhD, Pier Consulting Group, Inc**

**phirozza@msu.edu | 647.393.1014**

**UNITED STATES DISTRICT COURT**

**CENTRAL DISTRICT OF CALIFORNIA**

**GABRIELLE WORTMAN**

**vs.**

**AMAZON SERVICES LLC and HENKEL CORPORATION**

**CASE NO. 2:24-CV-06022-GW-AGR**

**SEPTEMBER 25, 2025**

**RULE 26 EXPERT REPORT**

## I.   **Background and Professional Qualifications**

I specialize in operations and global supply chain practices and have held a number of academic, executive and senior management roles focused on Supply Chain and Operations Management.

As an academic, I have authored and published articles regarding supply chain planning and management strategies.  In addition, I currently hold faculty appointments at Harvard University and Michigan State University, where I develop and teach undergraduate and graduate courses focusing on Supply Chain Management, Data Analytics, Supply Chain Analytics, and Operations Management.  Previously, I was a professor at and University of California, San Diego and University of Southern California, where I developed and instructed undergraduate and graduate level courses on Operations Management, Supply Chain Consulting and Data Analytics for Decision Making.

I hold a PhD in Supply Chain Management (with a focus on hierarchical decision making patterns for the placement of physical supply chain entities), from University of Cape Town's Graduate School of Business.  I have earned an MBA from Wayne State's Ilitch School of Business, as well as a Bachelor of Science (Honors, Computer Information Systems), and Bachelor of Computer Science from University of Windsor.  A copy of my current CV is attached to this report as **Appendix A.**

As a practitioner, I have held senior supply chain market planning and trade marketing appointments at Proctor & Gamble Company, and TELUS Communications Inc.  In these roles, I managed marketing analytics, and oversaw international supply chain projects in partnership with retailers (e.g., Wal-Mart, Target) involving major P&G brands (e.g., Iams, Tide).   Various supply chain initiatives that I have implemented on these projects, including demand forecasting processes, simulations, on-time metrics, logistics protocol and     fulfillment     performance     metrics,     are     still     in     place     today.

As a founding partner at Pier Consulting Group, I have consulted for medium-to-large-

sized corporations on how to optimize their supply chain planning practices. My work for these clients has included simulated projection and forecasting, regression techniques and analysis, and clustering evaluation in determining the validity and reliability of demand and supply projections.

I have served as an expert witness on supply chain and operations management issues for both plaintiffs and defendants in approximately sixteen cases in the last four years. A list of cases in which I have testified as an expert at trial or by deposition in the last four years is attached to this report as **Appendix B**.

## II.     <u>Scope of Analysis</u>

I was retained in the above referenced case to analyze the development and distribution of the Combat Max Roach Killing Bait Station product relative to accepted operations and supply chain industry practices at the manufacturing stage (including quality assurance, labeling, and safety testing), as well as at the retail stage.

In conducting my analysis and forming my opinions in this case, I relied on my industry and academic experience as well as file materials and references, a complete list of which is attached to this report as **Appendix C**.

## III.     <u>Analysis and Opinions</u>

A supply chain is an umbrella term, which aims to explain a variety of functions and processes present in the sourcing, production, distribution, purchasing and consumption phases of a product.

There is an inherent level of trust which exists within different nodes of a supply chain, in which each node is expected and required to collaborate, in ensuring an efficient passage of sourcing, manufacturing, distribution and sale of a product.

Commonalities often exist in factors which affect consumer purchase behavior. Often, perceived brand reputation, perceived retail reputation, and pricing are all factors which contribute to consumer behavioral patterns, and result in consumer purchases (and repeat purchases).

Within the framework of a supply chain, various entities play a variety of pivotal roles in the movement of a product from supply to consumption. The complex connection and optimization of numerous businesses working together is the focus of supply chain management.

From an academic perspective, a supply chain is a network of businesses directly or indirectly involved in the development and distribution of a product. While each supply chain will have a unique design and behave differently, logistical practices and logistics protocol are critical to the development of supply chain strategy and its overall functionality.

From a practical perspective, a supply chain describes connectivity and collaboration between several entities (e.g. supplier, manufacturer, distributor, retailer, end-user). Supply chain design and functionality is often driven by numerous factors (e.g. consumer behavior analysis, brand presence of retailer/product etc.), and is unique to each product.

## Henkel as the Manufacturer is Responsible for Ensuring the Subject Product is Safe for Consumer Use

In this case, Henkel (within their capacity as a manufacturer), accepted responsibility for ensuring products like the Combat Max 12 Month Roach Killing Bait, Small Roach Bait Station (the subject product) were safe for consumer use, and adequate usage and safety instructions were provided consistent with industry standards and practices.

### *Product Quality Assurance*

Each node within the supply chain plays a different role. While manufacturers (in this case Combat Insect Control Systems c/o Henkel Corporation manufactures and distributes the product for consumers in the United States for home use) are typically responsible for product development (including product integrity testing, compatibility testing, quality assurance, development of usage instructions, warning labels etc.), retailers (in this case, Amazon.com assumes the role of a retailer), ensure products are available to consumers using knowledge of their consumer purchasing behavior patterns, demand forecasts, etc., as well as information on product reputation.

While there is not a universally established industry standard for product quality testing, usage testing, product safety and quality testing often take place during the manufacturing phase of the supply chain. These processes are critical in evaluating overall product safety, and functionality. Within a typical supply chain infrastructure, the manufacturer (in this case Combat Insect Control Systems c/o Henkel Corporation) is ultimately charged with ensuring products introduced to the supply chain meet product quality, integrity and usage testing expectations and standards.

### *Product Labeling, Packaging and Consumer Behavior*

Consumer usage is largely dependent on user instruction. Zhao et al (2021)[1] notes "Packaging a product with relevant product details contributes positively to consumer buying behavior." There is no record or information available which discuss how labeling or packaging decisions were made by Henkel.

The approved EPA label[2], instructs users to 'break apart the bait', noting specifically: "Use

---

[1] Zhao, H., Jiang, J., Xu, P., & Yu, L. (2021). Impact of pricing and product information on consumer buying behavior with customer satisfaction in a mediating role. *Frontiers in Psychology*, 12, 720151. https://doi.org/10.3389/fpsyg.2021.720151

[2] HENKEL-000010-HENKEL-000017

*Wortman v. Amazon/Henkel*
Page **5** of **12**

all [6] [12] [18] baits. Break baits apart. Place all baits where roaches are found as shown in the diagram[s][ to the [right] [left] [above] [below.]] [Use enclosed stickers as needed.] Do not use in beehives."

Based on this direction, it would seem appropriate for a user to use their hands to break apart the product (there are no instructions provided, which state gloves are necessary). The fact that this injury was exclusive to the right eye, correlating with the hand used to handle the bait and remove the right contact lens, suggests that the chemical exposure contributed to the injury.

The active ingredient for the subject product is a chemical called 'Fipronil'. There are several publicly accessible documents on the internet which specifically discuss the dangers and risks of Fipronil[3], specifically noting the risk of eye irritation, and various tests which have been conducted on eye irritation.

While Henkel Corporation ("Henkel") claims to have 'undergone extensive testing and toxicological studies'[4], it appears the only testing for whether the product caused eye irritation or injury was undertaken by Clorox in 1995 and was conducted on rabbits[5]. Notably, this study did not include any test specific to contact lenses.

---

[3] Jackson, D., Cornell, C. B., Luukinen, B., Buhl, K., & Stone, D. (2009). Fipronil technical fact sheet. *National Pesticide Information Center, Oregon State University Extension Services*. https://npic.orst.edu/factsheets/archive/fiptech.html,

Merck & Co., Inc. (2025, April 14). Fipronil formulation safety data sheet (Version 6.0, SDS Number 4789413-00014). https://www.merck.com/docs/product/safety-data-sheets/ah-sds/Fipronil%20Formulation_AH_US_EN.pdf,

Australian Pesticides and Veterinary Medicines Authority. (n.d.). *Fipronil preliminary review findings: Volume 2, occupational health and safety*. https://www.apvma.gov.au/sites/default/files/publication/15181-fipronil-prf-vol2-ohs.pdf

[4] Henkel Answer to Amended Complaint [Doc #27]

[5] HENKEL-000268-HENKEL-000294

It appears in or around 2006 Henkel acquired a similar product (the Combat Max Roach Killing Gel) also sold on Amazon. This similar Gel product, like the subject product, also contains the active ingredient Fipronil.[6]

This similar Gel product contains 0.01% Fipronil and includes a safety warning, specifically noting:

> "Hazards to Humans and Domestic Animals Harmful if absorbed through skin. Causes moderate eye irritation. Avoid contact with skin, eyes and clothing. Prolonged or frequently repeated skin contact may cause allergic reactions in some individuals. Wash thoroughly with soap and water after handling and before eating, drinking, chewing gum, using tobacco, or using the toilet. FIRST AID: If on skin or clothing: Take off contaminated clothing. Rinse skin immediately with plenty of soap and water for 15 to 20 minutes. Call a Poison Control Center or doctor for treatment advice. If in eyes: Hold eye open, rinse eye slowly and gently with water for 15 to 20 minutes. Remove contact lenses, if present, after the first 5 minutes, then continue rinsing eye. Call a Poison Control Center or doctor for treatment advice."

The subject product contains 0.05% Fipronil and does not include a safety warning specific to eyes or contact lenses. Henkel appears to have been aware as early as 2006 of the potential danger to contact lens wearers from a similar product containing a lower concentration of Fipronil than the subject product. As the manufacturer, it was within Henkel's ability to include the same warning label on its other products which also included Fipronil.

To date, it appears Henkel did not conduct and has not conducted any testing or toxicological study of the subject product related to ocular exposure and as of October

---

[6] Amazon.com. (n.d.). Combat max ant killing gel syringe for indoor and outdoor use [Product page]. https://www.amazon.com/Combat-Killing-Indoor-Outdoor-Syringe/dp/B0CP4G3VRP?th=1

2022 when Ms. Wortman purchased and used the subject product, it still contained 0.05% Fipronil.

Per Ms. Wortman's deposition[7], it appears she read and followed the hand washing directions on the back of the box: "Q. Okay. After you placed it underneath your refrigerator, what was the next thing that you did? A. I washed my hands." She noted that there were no instructions for wearing gloves: "I specifically remember it didn't say anything about wearing gloves."

Ms. Wortman's compliance with the label's hand-washing instruction, yet lack of guidance on thoroughness or additional precautions (e.g., remove contact lenses, use gloves, etc.), suggests residual Fipronil may have persisted on her hand and/or finger(s).

Other cockroach treatment products have different active ingredients (e.g. Imdacleprid, Imiprothin, Deltamethrin, etc.)[8], and are sold on Amazon.com, demonstrating that it would be possible to make a cockroach bait which does not contain Fipronil.

This essentially suggests that Henkel may have been able to use an alternative active ingredient in manufacturing this product, which may not have contained an unsafe chemical such as Fipronil.

**Amazon as a Retailer is Responsible for Ensuring Products Listed on their Platform Meet Safety and Quality Standards**

Amazon (within their capacity as the main customer-facing entity within the supply chain), accepted responsibility for ensuring products listed on the Amazon.com platform like the

---

[7] Deposition, Wortman Gabrielle 04.03.25

[8] Amazon.com. (n.d.). Hot Shot ultra liquid roach bait, 6-count [Product page]. https://www.amazon.com/Hot-Shot-Ultra-Liquid-6-Count/dp/B001EGMZC0?th=1

Amazon.com. (n.d.). Advion cockroach gel bait tubes for control by Syngenta [Product page]. https://www.amazon.com/Advion-Cockroach-Tubes-Control-Syngenta/dp/B0148W0WOE?th=1

subject product met safety and quality standards, and have overtly publicized this assurance to consumers.

In a traditional supply chain, a 'retailer' is typically the node within the supply chain at which a consumer purchases a product. Similar to brick-and-mortar retailers (e.g. Target, Walmart, CVS etc.), numerous academic publications have classified Amazon as fulfilling the role of a retailer:

> Wahba (2014)[9] notes, 'After years of stealing market share from its brick-and-mortar brethren, Amazon (AMZN) is finally among the 10 largest retailers according to ranking released on Tuesday by Stores Magazine. It is the first time a pure-play e-commerce company joins the very upper echelons of the hit parade.'

> Shalicky (2013)[10] notes, 'Amazon.com is a large online retailer that has enjoyed growing success in providing many people from different countries with an online marketplace that sells a variety of items.'

In its capacity as a retailer, Amazon acknowledges various responsibilities. Madhani, P.M. (2021)[11] notes "Retailers are the terminal points of a supply chain, where products and customers meet, and sales revenue is generated for the entire supply chain, necessitating effective retail Supply Chain Management (SCM)."

---

[9] Wahba, P. (2014, July 1). Amazon ranks among retail's 10 biggest companies for the first time. *Fortune*. http://fortune.com/2014/07/01/10-largest-retailers-amazon/

[10] Skalicky, S. (2013). Was this analysis helpful? A genre analysis of the Amazon.com discourse community and its "most helpful" product reviews. *Discourse, Context & Media*, *2*, 84-93. https://www.researchgate.net/publication/257742825_Was_this_analysis_helpful_A_genre_analysis_of_the_Amazoncom_discourse_community_and_its_most_helpful_product_reviews

[11] Madhani, P. M. (2021). Retail supply chain management: Building a customer-focused approach with competitive priorities. The IUP Journal of Supply Chain Management, 18(2), 7-27.

As an assumed retailer, Amazon coordinates the distribution of inventory (often taking ownership and/or custodianship of inventory). From a consumer-facing perspective, Amazon has publicized numerous services, including (but not limited to):

- o Its ability to monitor product safety and ensure quality assurance standards are in place.
- o Accepting product returns (including damaged and defective products).
- o Accepting payment from consumers.
- o Attending to consumer complaints / delivery issues

On Amazon's 'Recalls and Product Safety Alerts' website[12], the following passage is noted:

- o *'Our Product Safety Team proactively investigates and addresses reported safety complaints and incidents to ensure customer protection from potential product-related safety risks. We closely monitor public recall alert websites and receive notifications from vendors and sellers. Upon discovering a product recall, we immediately halt affected product offerings, and promptly inform both customers and sellers involved about the recall.'*

Similarly, on Amazon's 'Help & Customer Service' website[13], the following passages are noted:

- o *'Our Product Safety Team investigates and acts on reported safety complaints and incidents to protect customers from risks of injury related to products sold on Amazon.com. Our Recalls team monitors for, identifies, and executes recalls and safety alerts related to products sold or previously sold on Amazon.com.'*
- o *We closely monitor public recall alert websites and receive notifications from vendors and sellers. When we learn of a recall or safety alert, we remove*

---

[12] Amazon.com. (n.d.). Recalls and product safety alerts. https://www.amazon.com/product-safety-alerts?ref_=footer_bsx_ypsa

[13] Amazon.com. (n.d.). Product safety and recalls. https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X

*Wortman v. Amazon/Henkel*
Page **10** of **12**

*the product from our store and supply chain to prevent unsafe product from reaching our customers. We promptly inform both customers and sellers about the recall or safety alert.*

o *We monitor the products sold on our website for product safety concerns. In concerning situations, we may do the following:*

o *Remove the product from the website.*

o *Contact sellers and manufacturers for more information.*

o *Put warnings on the product detail page.*

o *Take other actions depending on the situation.*

o *Report product safety concerns to relevant government agencies. This will strengthen their safety data and help with any necessary recalls.*

In evaluating the listing for the subject product on Amazon.com[14], it appears that there are no restrictions, limitations or constraints in place to effectively control access. No specific buyer qualifications are necessary. The product is marketed toward all users (not only professionals), meaning that anyone with an Amazon account can purchase the item.

By making numerous claims about keeping customers safe from dangerous products, Amazon is overtly stating that Amazon's policies and procedures proactively protect consumers from dangerous products and goods sold on Amazon.com. As these claims are publicized on the consumer-facing website (a simple google search for 'Amazon recalls' results in these websites being the top two results), it can be assumed that consumers rely on these assurances.

---

[14] Amazon.com. (n.d.). Combat 12 month roach killing bait station [Product page]. https://www.amazon.com/Combat-Month-Roach-Killing-Station/dp/B000KL1LDE

*Wortman v. Amazon/Henkel*
Page **11** of **12**

All opinions are given to a reasonable degree of professional certainty. I reserve the right
and opportunity to supplement and/or amend my opinions if/when additional information
becomes available.


Zal Phiroz, PhD

# Appendix A

Case 2:24-cv-02602-TLW-AGRY   Document 82-1   Filed 11/13/25   Page 27 of 59   Page ID #:1409

# Appendix A

# Zal Phiroz, PhD

phirozza@msu.edu | 647.393.1014

---

## HIGHLIGHTS

- Director-level supply chain appointments at Procter & Gamble (NYSE: PG); TELUS (NYSE:T).
- Faculty appointments at Harvard University; Michigan State University (previously UCSD, UCLA).
- PhD (Supply Chain Management).  Inclusive Practice Fellowship at Harvard University.
- Expert testimony on matters docketed in State and Federal district courts.

---

## ACADEMIA

A/Professor and Lecturer, Supply Chain Management, Data Analysis (Term                April 2013 – Present
**Harvard University | DCE - Graduate School of Arts & Sciences                  Cambridge, MA**

Developed and instructed graduate courses within the area of Supply Chain and Operations Management.  Direct interaction with fortune 1000 C-suite industry advisors and speakers.

- Focused on the practical application of decision tree modeling, logistic regression, linear programming and various supply chain and operations protocol.
- Initiated project collaboration through cases with Procter & Gamble, Unilever, Bombardier.

A/Professor, Department of Supply Chain Management                        August 2019 – Present
**Michigan State University | Broad College of Business                        East Lansing, MI**

Developed and instructed senior undergraduate, MSBA, MBA courses in Business Analytics, Supply Chain Analytics and Supply Chain Management.

- Hosted C-suite speakers, and collaborated with industry partners (Netflix, Google, IBM) ensuring course content alignment with market trends and industry recruitment standards.
- Course content integrating industry trends with analysis of various operations / supply chain areas (e.g. including forecasting, procurement, retail, manufacturing, distribution etc.).
- Focused on analysis of various operational/supply chain areas including forecasting, demand projection, queueing, and data mining areas including regression, clustering, classification.

A/Professor and Lecturer, Operations and Data Analytics                    October 2014 – August 2019
**University of Southern California | Marshall School of Business                  Los Angeles, CA**

Developed and instructed compulsory junior and senior level undergraduate, MS, MBA and OMBA courses in Operations Management, Management Consulting and Data Analytics for Decision Making.

- Developed data analysis modules on supply chain analysis including regression through JMP/R, focusing on clustering, classification, forecasting, queueing etc.
- Developed core Operations and Data Analysis courses for the undergraduate and initial Online MBA curriculum (ranked 5th in US News 2019 and 1st in Poets & Quants, 2018).

| **INDUSTRY** |
|---|

Founding Partner        April 2010 - Present
**Pier Consulting Group Inc.**        **Los Angeles, CA | Windsor, ON**

Collaboration with medium/large corporations on various areas of data analysis including sustainability, global logistics, supply chain management metrics, marketing segmentation and forecasted demand simulation.

- Direct market research and data analysis on competitive markets, cluster target demographics, growth opportunities and market niches.
- Predictive modeling and demand projection through various forms of regression analysis, meeting cross-functional cost optimization strategies.
- Collaboration with fortune 500 corporations including Procter & Gamble, DHL and Accenture.
- Consultation on quality control, manufacturing standards, and product liability.
- Directors Award for Excellence- Global Fleet and Products, Amazon Inc. (2022).

Sr. Manager, Market Planning (North America)        September 2007 - March 2010
**Procter & Gamble Co.**        **Cincinnati, OH | Toronto, ON**

Managed national and international supply chain projects across the entire Procter & Gamble product portfolio. Responsible for market data analysis, demand forecasting and projection, national/international process customization, resource usage and high-level market analysis.

- Managed international supply chain processes and optimization initiatives across Procter & Gamble's $2.9B pet care sector.
- Developed and managed forecasting initiatives leading to projected cost savings of $14M.
- Led cross-functional US and Canadian analysis teams in the area of shrink. Recommended and successfully implemented strategies to reduce margin loss at partner retailers, warehouse and production plants, resulting in annual savings of $23M across all banners.
- Initiated and managed national pilot programs for joint forecasting and supply chain customization with major partner retailers including Wal-Mart, Target and Shoppers Drug Mart.

Sr. Manager, Business Programs (Trade Marketing)        October 2005 - May 2007
**TELUS Communications Inc.**        **Toronto, ON**

Developed business programs within the TELUS data portfolio, interfacing with Product Development Direct Marketing, and Marketing Communications teams. Managed marketing objectives and developed specific sales programs using classification and projection regression simulation.

- Collaborated directly with sales channels (Independent Dealers, Enterprise, and Small/Medium Business) in establishing sales targets, distribution and promotional objectives.
- Managed the entire data portfolio ($1.8B) including Research in Motion, Palm and Motorola accounts.

## EDUCATION AND PROFESSIONAL CREDENTIALS

PhD | Doctor of Philosophy (Dissertation: Hierarchical Decision Making Patterns for the Placement of Physical Supply Chain Entities) — July 2017
**University of Cape Town | Graduate School of Business** — **Rondebosch, SA**

MBA | Master of Business Administration (International Marketing) — May 2005
**Wayne State University | Ilitch School of Business** — **Detroit, MI**

BS (Hons) | Bachelor of Science (Honors, Computer Information Systems) — October 2003
**University of Windsor | School of Computer Science** — **Windsor, ON**

BCS | Bachelor of Computer Science — June 2003
**University of Windsor | School of Computer Science** — **Windsor, ON**

CIPM | Certified International Procurement Manager — June 2016
CISCM | Certified International Supply Chain Manager — December 2015
CISCPM | Certified International Supply Chain Planning Manager — March 2019
**International Purchasing and Supply Chain Management Institute** — **Los Angeles, CA**

## HONORS AND AWARDS

**Harvard University**, Inclusive Practice Fellowship, 2023 - Present.

**Amazon Inc.**, Directors Award for Excellence- Global Fleet and Products, 2022.

**University of Southern California**, Deans Award for Community Development, 2017.

**University of Southern California**, Golden Apple Award for Clinical Faculty, 2016.

## SELECTED PRESENTATIONS AND PUBLICATIONS

Phiroz, Z. N. (2024), *The Baltimore Bridge Collapse Is About to Get Even Messier*. [Quote]. Wired Magazine (www.wired.com/story/baltimore-bridge-collapse-shipping-supply-chain-disruption-francis-scott-key/)

Phiroz, Z. N. (2024). *Perspectives of Supply Chain Competitiveness— A Handbook*. J Ross Publishing (https://jrosspub.com/catalog/business-default-category/operations-management/perspectives-of-supply-chain-competitiveness/)

Phiroz, Z. N., Bezada, N. (2024). *Legal Issues Loom for Driverless Trucking*. Law360 (www.law360.com/articles/1792782)

Phiroz, Z. N. (2024) "Transport." *The Chain: How the World Works*, Season 1, Episode 2, Amazon Prime Video (www.amazon.com/gp/video/detail/B0DM9S6TYY/).

Phiroz, Z. N. (2022). *What Happened Here with Food Prices? Supply Chains?*. WVOX Radio, New York (www.youtube.com/watch?v=f6YSCySqgBU)

Phiroz, Z. N. (2021). *Big Data: Application of Data in Defensive Merchandising and Shrink*. [Keynote Presentation]. Institute for Supply Management, Grand Rapids.

# Appendix B

**Prior Litigation Consulting and Expert Witness Experience (2021 - 2025)**

**Dr. Zal Phiroz**

| | Case | Year | Law Firm | Client | Deposition Date | Trial Date | Court/Venue | Case Number |
|---|---|---|---|---|---|---|---|---|
| 1 | Home Depot USA Inc. v. CCVI LLC et al. | 2021 | Thompson & Colegate LLP | Defense | July, 2021 | N/A | Superior Court of California, County of Riverside | RIC1901439 |
| 2 | I&I Hair Co. v. Beauty Plus Co. | 2021 | Sul Lee Law Firm LLP | Plaintiff | March, 2022 | TBD | Northern District of Texas, Dallas Division | 3:18-cv-3254-M |
| 3 | Melendez v. 3M Inc. | 2021 | Cole Law LLP | Plaintiff | September, 2022 | N/A | Harris County, Texas, 164th Judicial District | 2018-23719 |
| 4 | Zantac MDL v. Pfizer, et al. | 2021 | Beasley Allen LLP | Plaintiff | May, 2022 | TBD | United States District Court, Southern District of Florida | 2924 20-MD-2924 |
| 5 | Kroger v. Waxman, et al. | 2022 | Vorys LLP | Defense | July, 2022 | N/A | Arbitration | 01-21-0012-7354 |
| 6 | Martin v. Cintas et al. | 2022 | Arnold & Itkin LLP | Plaintiff | November, 2022 | N/A | Parish of East Baton Rouge, State of Louisiana | C-669821 |
| 7 | Lloyds Underwriters v. Rainbow Gold Inc. | 2022 | Quintairos, Prieto, Wood & Boyer | Plaintiff | June, 2023 | TBD | Circuit Court of Etowah County, Alabama | 31-CV-2019-900561.00 |
| 8 | Lan Global v. Alchemy et al. | 2022 | Novian & Novian LLP | Plaintiff | February, 2024 | N/A | United States District Court, District of Massachusets | 1:22-CV-11763 |
| 9 | Zantac (City of Baltimore) v. Pfizer, et al. | 2023 | Grant & Eisenhofer P.A. | Plaintiff | April, 2024 | TBD | Circuit Court of Maryland, Baltimore City | 24-C-20-004788 |
| 10 | Loyal, et al. v. Ford Motor Company, et al. | 2023 | Ragsdale Liggett LLP | Defense | May, 2024 | N/A | General Court of Justice, Superior Court Division | 19-CVS-1486 |
| 11 | Baron v. Grocery Outlet et al. | 2024 | Hawkins Parnell LLP | Defense | August, 2024 | September, 2024 | Superior Court of California, County of San Francisco | CGC-21-595334 |
| 12 | Shiplion v. Baublebar | 2024 | Dentons US LLP | Defense | October, 2024 | TBD | Supreme Court of New York, County of New York | 653927 |
| 13 | Gold3PL v. Bailey's Blossoms LLC | 2025 | Alexander, P.C. | Defense | February, 2024 | N/A | Arbitration | 1952195.5 |
| 14 | Zantac (City of Baltimore) v. Pfizer, et al. | 2025 | Grant & Eisenhofer P.A. | Plaintiff | June, 2025 | TBD | Circuit Court of Maryland, Baltimore City | 24-C-20-004788 |
| 15 | Weber v. Amazon.com Services et al. | 2025 | Morgan & Morgan P.A. | Plaintiff | September, 2025 | TBD | United States District Court, District of Massachusets | 1:24-cv-11617-WGY |

# Appendix C

**i e M  eri**

- Deposition of Gabrielle Wortman Volumes I and II; Exhibits
- Deposition of Oliver Johnson; Exhibits
- Depositions of PMQ of Henkel Volumes I and II; Exhibits
- Complaint
- Answer
- Stipulated Protective Order
- Defendant Henkel's Rule 26 Disclosures
- Defendant Amazon's Rule 26 Disclosures
- Plaintiff's Rule 26 Disclosures
- Defendant Henkel's Responses to Plaintiff's Interrogatories
- Defendant Henkel's Responses to Plaintiff's Request for Production of Documents
- Defendant Henkel's Document Production
- Defendant Amazon's Responses to Plaintiff's Interrogatories
- Defendant Amazon's Responses to Plaintiff's Request for Production of Documents
- Defendant Amazon's Document Production
- Plaintiff's Responses to Defendant Henkel's Interrogatories
- Plaintiff's Responses to Defendant Henkel's Request for Admissions
- Plaintiff's Responses to Defendant Henkel's Request for Production of Documents
- Plaintiff's Document Production
- Inova Alexandria Hospital Medical Records from
- Medical Records from George Washington University Hospital
- Medical Records from Keck Hospital of USC
- Medical Records from UCI Health
- IME Report by Alan Shabo, M.D.

**Re eren e  Ci ed**

1. Wahba, P. (2014, July 1). Amazon ranks among retail's 10 biggest companies for the first time. *Fortune*. http://fortune.com/2014/07/01/10-largest-retailers-amazon/

2. Skalicky, S. (2013). Was this analysis helpful? A genre analysis of the Amazon.com discourse community and its "most helpful" product reviews. *Discourse, Context & Media, 2,* 84-93. https://www.researchgate.net/publication/257742825_Was_this_analysis_helpful_A_genre_analysis_of_the_Amazoncom_discourse_community_and_its_most_helpful_product_reviews (publicly available);

3. Madhani, P. M. (2021). Retail supply chain management: Building a customer-focused approach with competitive priorities. The IUP Journal of Supply Chain Management, 18(2), 7-27 (copy enclosed);

4. Amazon.com. (n.d.). Recalls and product safety alerts. https://www.amazon.com/product-safety-alerts?ref_=footer_bsx_ypsa (publicly available);

5. Amazon.com. (n.d.). Product safety and recalls. https://www.amazon.com/gp/help/customer/display.html?nodeId=GLD7VXFKV4AWU78X (publicly available);

6. Amazon.com. (n.d.). Combat 12 month roach killing bait station [Product page]. https://www.amazon.com/Combat-Month-Roach-Killing-Station/dp/B000KL1LDE (publicly available);

7. Jackson, D., Cornell, C. B., Luukinen, B., Buhl, K., & Stone, D. (2009). Fipronil technical fact sheet. *National Pesticide Information Center, Oregon State University Extension Services*. https://npic.orst.edu/factsheets/archive/fiptech.html (publicly available);

8. Merck & Co., Inc. (2025, April 14). Fipronil formulation safety data sheet (Version 6.0, SDS Number 4789413-00014). https://www.merck.com/docs/product/safety-data-sheets/ah-sds/Fipronil%20Formulation_AH_US_EN.pdf (publicly available);

9. Australian Pesticides and Veterinary Medicines Authority. (n.d.). *Fipronil preliminary review findings: Volume 2, occupational health and safety*. https://www.apvma.gov.au/sites/default/files/publication/15181-fipronil-prf-vol2-ohs.pdf (publicly available);

10. Amazon.com. (n.d.). Combat max ant killing gel syringe for indoor and outdoor use [Product page]. https://www.amazon.com/Combat-Killing-Indoor-Outdoor-Syringe/dp/B0CP4G3VRP?th=1 (publicly available);

11. Amazon.com. (n.d.). Hot Shot ultra liquid roach bait, 6-count [Product page]. https://www.amazon.com/Hot-Shot-Ultra-Liquid-6-Count/dp/B001EGMZC0?th=1 (publicly available);

12. Amazon.com. (n.d.). Advion cockroach gel bait tubes for control by Syngenta [Product page]. https://www.amazon.com/Advion-Cockroach-Tubes-Control-Syngenta/dp/B0148W0WOE?th=1 (publicly available); and

13. Zhao, H., Jiang, J., Xu, P., & Yu, L. (2021). Impact of pricing and product information on consumer buying behavior with customer satisfaction in a mediating role. *Frontiers in Psychology*, 12, 720151. https://doi.org/10.3389/fpsyg.2021.720151 (publicly available).

# EXHIBIT B

# Zal Phiroz, PhD

phirozza@msu.edu  |  647.393.1014

---

## HIGHLIGHTS

- Director-level supply chain appointments at Procter & Gamble (NYSE: PG); TELUS (NYSE:T).
- Faculty appointments at Harvard University; Michigan State University (previously UCSD, UCLA).
- PhD (Supply Chain Management).  Inclusive Practice Fellowship at Harvard University.
- Expert testimony on matters docketed in State and Federal district courts.

## ACADEMIA

A/Professor and Lecturer, Supply Chain Management, Data Analysis (Term          April 2013 –  Present
**Harvard University | DCE - Graduate School of Arts & Sciences**          **Cambridge, MA**

Developed and instructed graduate courses within the area of Supply Chain and Operations Management.  Direct interaction with fortune 1000 C-suite industry advisors and speakers.

- Focused on the practical application of decision tree modeling, logistic regression, linear programming and various supply chain and operations protocol.
- Initiated project collaboration through cases with Procter & Gamble, Unilever, Bombardier.

A/Professor, Department of Supply Chain Management          August 2019 – Present
**Michigan State University | Broad College of Business**          **East Lansing, MI**

Developed and instructed senior undergraduate, MSBA, MBA courses in Business Analytics, Supply Chain Analytics and Supply Chain Management.

- Hosted C-suite speakers, and collaborated with industry partners (Netflix, Google, IBM) ensuring course content alignment with market trends and industry recruitment standards.
- Course content integrating industry trends with analysis of various operations / supply chain areas (e.g. including forecasting, procurement, retail, manufacturing, distribution etc.).
- Focused on analysis of various operational/supply chain areas including forecasting, demand projection, queueing, and data mining areas including regression, clustering, classification.

A/Professor and Lecturer, Operations and Data Analytics          October 2014 – August 2019
**University of Southern California | Marshall School of Business**          **Los Angeles, CA**

Developed and instructed compulsory junior and senior level undergraduate, MS, MBA and OMBA courses in Operations Management, Management Consulting and Data Analytics for Decision Making.

- Developed data analysis modules on supply chain analysis including regression through JMP/R, focusing on clustering, classification, forecasting, queueing etc.
- Developed core Operations and Data Analysis courses for the undergraduate and initial Online MBA curriculum (ranked 5th in US News 2019 and 1st in Poets & Quants, 2018).

**INDUSTRY**

Founding Partner                                                    April 2010 - Present
**Pier Consulting Group Inc.**                         **Los Angeles, CA | Windsor, ON**

Collaboration with medium/large corporations on various areas of data analysis including sustainability, global logistics, supply chain management metrics, marketing segmentation and forecasted demand simulation.

- Direct market research and data analysis on competitive markets, cluster target demographics, growth opportunities and market niches.
- Predictive modeling and demand projection through various forms of regression analysis, meeting cross-functional cost optimization strategies.
- Collaboration with fortune 500 corporations including Procter & Gamble, DHL and Accenture.
- Consultation on quality control, manufacturing standards, and product liability.
- Directors Award for Excellence- Global Fleet and Products, Amazon Inc. (2022).

Sr. Manager, Market Planning (North America)          September 2007 - March 2010
**Procter & Gamble Co.**                               **Cincinnati, OH | Toronto, ON**

Managed national and international supply chain projects across the entire Procter & Gamble product portfolio. Responsible for market data analysis, demand forecasting and projection, national/international process customization, resource usage and high-level market analysis.

- Managed international supply chain processes and optimization initiatives across Procter & Gamble's $2.9B pet care sector.
- Developed and managed forecasting initiatives leading to projected cost savings of $14M.
- Led cross-functional US and Canadian analysis teams in the area of shrink. Recommended and successfully implemented strategies to reduce margin loss at partner retailers, warehouse and production plants, resulting in annual savings of $23M across all banners.
- Initiated and managed national pilot programs for joint forecasting and supply chain customization with major partner retailers including Wal-Mart, Target and Shoppers Drug Mart.

Sr. Manager, Business Programs (Trade Marketing)          October 2005 - May 2007
**TELUS Communications Inc.**                                        **Toronto, ON**

Developed business programs within the TELUS data portfolio, interfacing with Product Development Direct Marketing, and Marketing Communications teams. Managed marketing objectives and developed specific sales programs using classification and projection regression simulation.

- Collaborated directly with sales channels (Independent Dealers, Enterprise, and Small/Medium Business) in establishing sales targets, distribution and promotional objectives.
- Managed the entire data portfolio ($1.8B) including Research in Motion, Palm and Motorola accounts.

## EDUCATION AND PROFESSIONAL CREDENTIALS

PhD | Doctor of Philosophy (Dissertation: Hierarchical Decision Making Patterns for the Placement of Physical Supply Chain Entities)    July 2017
**University of Cape Town | Graduate School of Business**    **Rondebosch, SA**

MBA | Master of Business Administration (International Marketing)    May 2005
**Wayne State University | Ilitch School of Business**    **Detroit, MI**

BS (Hons) | Bachelor of Science (Honors, Computer Information Systems)    October 2003
**University of Windsor | School of Computer Science**    **Windsor, ON**

BCS | Bachelor of Computer Science    June 2003
**University of Windsor | School of Computer Science**    **Windsor, ON**

CIPM | Certified International Procurement Manager    June 2016
CISCM | Certified International Supply Chain Manager    December 2015
CISCPM | Certified International Supply Chain Planning Manager    March 2019
**International Purchasing and Supply Chain Management Institute**    **Los Angeles, CA**

## HONORS AND AWARDS

**Harvard University**, Inclusive Practice Fellowship, 2023 - Present.

**Amazon Inc.**, Directors Award for Excellence- Global Fleet and Products, 2022.

**University of Southern California**, Deans Award for Community Development, 2017.

**University of Southern California**, Golden Apple Award for Clinical Faculty, 2016.

## SELECTED PRESENTATIONS AND PUBLICATIONS

Phiroz, Z. N. (2024), *The Baltimore Bridge Collapse Is About to Get Even Messier*. [Quote]. Wired Magazine (www.wired.com/story/baltimore-bridge-collapse-shipping-supply-chain-disruption-francis-scott-key/)

Phiroz, Z. N. (2024). *Perspectives of Supply Chain Competitiveness— A Handbook*. J Ross Publishing (https://jrosspub.com/catalog/business-default-category/operations-management/perspectives-of-supply-chain-competitiveness/)

Phiroz, Z. N., Bezada, N. (2024). *Legal Issues Loom for Driverless Trucking*. Law360 (www.law360.com/articles/1792782)

Phiroz, Z. N. (2024) "Transport." *The Chain: How the World Works*, Season 1, Episode 2, Amazon Prime Video (www.amazon.com/gp/video/detail/B0DM9S6TYY/).

Phiroz, Z. N. (2022). *What Happened Here with Food Prices? Supply Chains?*. WVOX Radio, New York (www.youtube.com/watch?v=f6YSCySqgBU)

Phiroz, Z. N. (2021). *Big Data: Application of Data in Defensive Merchandising and Shrink*. [Keynote Presentation]. Institute for Supply Management, Grand Rapids.

# EXHIBIT C

EXHIBT C

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION


GABRIELLE WORTMAN, an          )
individual,                    )
                               )
          Plaintiff,           )
                               ) CASE NO. 2:24-cv-06022 GW
     vs.                       ) (AGRx)
                               )
AMAZON.COM SERVICES LLC;       )
AMAZON.COM; HENKEL             )
CORPORATION, a subsidiary      )
of HENKEL AG & CO. KGaA;       )
DOE SELLER; DOE                )
DISTRIBUTOR; and DOES 1 to     )
100, inclusive,                )
                               )
          Defendants.          )
_____ )




REMOTE DEPOSITION OF ZAL PHIROZ, PhD

Toronto, Ontario

October 14, 2025




REPORTED BY:  ASHLEY L. PROXMIRE, CSR

License No. 13664



UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA - WESTERN DIVISION

| | | |
|---|---|---|
| GABRIELLE WORTMAN, an individual, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | CASE NO. 2:24-cv-06022 GW (AGRx) |
| vs. | ) | |
| | ) | |
| AMAZON.COM SERVICES LLC; AMAZON.COM; HENKEL CORPORATION, a subsidiary of HENKEL AG & CO. KGaA; DOE SELLER; DOE DISTRIBUTOR; and DOES 1 to 100, inclusive, | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

REMOTE DEPOSITION OF ZAL PHIROZ, PhD, taken via Zoom videoconference, on Tuesday, October 14, 2025, at 10:01 a.m., before Ashley L. Proxmire, Certified Shorthand Reporter, License No. 13664, in and for the State of California.



APPEARANCES


FOR THE PLAINTIFF:

FORMICA LAW GROUP

By: Kellian Summers, Esq.

5900 Wilshire Boulevard, Suite 2250

Los Angeles, California 90036

(323)272-3334

ksummers@formicalawgroup.com



FOR THE DEFENDANTS:


LYNBERG & WATKINS

By: Ryan J. Anderson, Esq.

1150 South Olive Street, 18th Floor

Los Angeles, California 90015

(213)624-8700

randerson@lynberg.com



ALSO PRESENT:

Joshua Oshima, Videographer



                              I N D E X

Examination                                              Page

By Mr. Anderson                                              7


              QUESTIONS  INSTRUCTED  NOT  TO  ANSWER

                      Page          Line


                    DOCUMENTS  REQUESTED

                      Page          Line



Page 5

I N D E X

| Exhibit | Description | Page |
|---------|-------------|------|
| 1 | Notice of Deposition | 11 |
| 2 | Curriculum Vitae | 12 |
| 3 | Prior Litigation Consulting and Expert Witness Experience | 25 |
| 4 | Report, 12 pages | 35 |


MAGNA
LEGAL SERVICES

Page 6

Tuesday, October 14, 2025, 10:01 a.m.

---ooOoo---

THE VIDEOGRAPHER:  Good morning.  We are now going on the record.  The time is 10:01 a.m. on Tuesday, October 14, 2025.  This begins the video-recorded deposition of Dr. Zal Phiroz taken in the matter of Gabrielle Wortman v. Amazon.com Services LLC, et al.

This case is filed in the U.S. District Court, Central District of California, case number of which is 2:24-cv-06022 GW.  This deposition is being held via Zoom videoconference with all participants attending remotely from separate locations.  My name is Joshua Oshim and I am your videographer on behalf of Magna Legal Services.

Counsel, would you please introduce yourselves and state your appearances, after which the court reporter will swear in the witness.

MS. SUMMERS:  Kellian Summers for the plaintiff.

MR. ANDERSON:  Ryan Anderson for the defendants.

THE COURT REPORTER:  Doctor, please raise your right hand.

Do you solemnly swear or affirm that the



Page 7

testimony you are about to give will be the truth, the

whole truth, and nothing but the truth?

THE WITNESS:  Yes.

THE COURT REPORTER:  Thank you.

My name is Ashley Proxmire, Certified Shorthand

Reporter for the State of California, License

Number 13664.

Counsel, you may proceed.

ZAL PHIROZ, PhD,

called as a witness by the Defendants, having been first

sworn remotely, was examined and testified as follows:

DIRECT EXAMINATION

BY MR. ANDERSON:

Q.   Good morning, Dr. Phiroz.  As I said at the

beginning, my name is Ryan Anderson.  I am one of the

attorneys for defendants in this matter.

How are you doing this morning?

A.   I am well.  Thank you.  And yourself?

Q.   Doing all right.

Where are you physically located right now?

A.   At the moment, I'm in Toronto, Ontario.

Q.   And pardon my lack of geographical knowledge,

but what is the time there?  Is there a time difference

between California?

A.   It is.  There is a three-hour time difference.



Page 16

A.   Interestingly enough, I think so, yes.  Not that I plan on opining on the chemical composition in this case.  That is not the area that I have been retained to opine on.  But I do believe that I did perhaps take a chemistry class in one of the computer science degrees that I took.

Q.   Okay.  And similar question, but did any of your education involve training or courses on toxicology?

A.   Not that I recall.

Q.   You don't have a medical license, correct?

A.   I do not.

Q.   Let's jump into your experience, your work experience.  It looks like your first position out of your master's program was at Telus Communications Inc.?

A.   It was, yes.

Q.   And what were your job duties there?

A.   So there were a number of duties.  The time that I worked at Telus is going back to a time before iPhones existed, where the data portfolio were BlackBerrys and various PDAs.  So my area of responsibility within this role was to evaluate data, understand exactly what was pushing the supply chain, understanding exactly what feedback was coming in from customers, understand what that might mean for product



Page 47

manufacturer runs a quality test or quality assurance test and deems it necessary to warn a consumer about a specific risk.  That warning could typically go on a label.

So while I don't brand myself as a labeling expert per se, the area of labeling is fundamental in the practice of supply chain management.

BY MR. ANDERSON:

Q.   Do you hold yourself out to be an expert in EPA approval of labels?

A.   I do not.

Q.   Do you understand that the product at issue was extremely regulated by the EPA, and the labeling process needed to be approved by the EPA?

MS. SUMMERS:  Object to the form.

THE WITNESS:  I believe that that is true to an extent, yes.

BY MR. ANDERSON:

Q.   What do you mean by "to an extent"?

A.   Well, from my understanding, an EPA approval is based on ideal conditions, theoretical use.  The -- the role of supply chain is to ensure that the actual product meets those assumption -- assumptions that are made for the purposes of EPA approval.  So, for example, EPA approval is great, but it doesn't necessarily



Page 61

just say hand washing but hand washing may not remove all of the residue?

A. Well, from my understanding -- I'm sorry. I didn't mean to --

Q. Yeah, no. One of your potential examples was, you know, the EPA can ensure that hand washing is on the label, but hand washing may not be enough to remove the residue. Is that a correct recitation of your example?

A. Yes.

Q. Okay. Do you have any indication, any evidence outside of Plaintiff's complaint that hand washing was insufficient to remove any residue of the product at issue in this case?

A. So I relied on the documentation that I received for this case, one of which was a sworn deposition by the -- by Ms. Wortman describing the fact that she had residue on her hand and that she did wash her hands and that she did remove her contact lens, as well as the medical report from, I believe it was the University of California Irvine which noted that there was residue on her cornea, if I recall.

Q. But again, you are not a medical doctor, correct?

A. As I stated earlier, I am not.

Q. And you are not an accident reconstruction


MAGNA
LEGAL SERVICES

Page 62

expert either, are you?

A. No. But I am a supply chain expert, and I do take cues from sworn testimony as well as medical reports, and I did in this case, in forming my opinions.

Q. You are not an optometrist?

A. I am not.

Q. And you are not an ophthalmologist, correct?

A. I am not.

Q. Give me one second. I apologize. One second.

Is it your understanding that Ms. Wortman did not have symptoms of this potential injury until a few hours after she placed this bait station?

MS. SUMMERS: Object to the form.

THE WITNESS: I believe so, yes, just from her sworn testimony.

BY MR. ANDERSON:

Q. Is it your testimony that the few hours after she placed the bait station and touched her eye, she had a residue on her finger?

MS. SUMMERS: Object to the form.

BY MR. ANDERSON:

Q. Or hand?

A. I think you asked if that was my opinion. That was what I'm basing my opinions on, sworn testimony, which is what she said she did, yes.


MAGNA
LEGAL SERVICES

Page 73

proceedings.)

MR. ANDERSON:  Yeah, we can take a break right now.  We can take a ten-minute break.

THE VIDEOGRAPHER:  Going off the record.  The time is 11:36 a.m.

(Whereupon, a break was taken.)

THE VIDEOGRAPHER:  We are now on the record.  The time is 11:51 a.m.

BY MR. ANDERSON:

Q.   Dr. Phiroz, you understand that you are still under oath?

A.   I do.

Q.   Did you speak with anyone during the break?

A.   I did.

Q.   Who did you speak with?

A.   Ms. Summers.

Q.   And what did you speak about?

A.   Ms. Summers called to say that everything was going well.  That was about it.

Q.   Did she discuss with you any of your testimony that might need to be changed?

A.   No.

Q.   Did you review any documents during the break?

A.   I did not.

Q.   Prior to this case, had you heard of the active


MAGNA
LEGAL SERVICES

ingredient Fipronil?

A.   No.

Q.   Now, on page 6 of your report, you've got a paragraph that -- the last paragraph:  While Henkel Corporation claims to have undergone extensive testing and toxicological studies, it appears the only testing for whether the product caused eye irritation or injury was undertaken by Clorox in 1995 and was conducted on rabbits.

Is that an accurate representation of your report?

A.   It is.

Q.   Do you have -- is it part of your testimony today that they -- well, let me strike that.

As an expert in supply chain management and operations, do you have any opinion on whether the testing was inadequate for this product?

MS. SUMMERS:  Object to the form.

THE WITNESS:  Well, it appears that the testing was done last in 1995 on rabbits, and I don't believe that there was any testing done on contact lens usage. The testing was done in 1995, which is 30 years ago from today.  Contact lens technology has changed.  I don't see any testing on contact lenses.

So I do believe that in a typical supply chain,



THE WITNESS:  That's not my statement.  That is possible.

BY MR. ANDERSON:

Q.   Are -- are you stating that Plaintiff used it different than how it was originally planned to be used back in 1995?

A.   That's not what I stated.  I am not stating that.

Q.   So if Plaintiff didn't use it differently, why would -- why would that matter, user changes over the years?

MS. SUMMERS:  Object to the form.

THE WITNESS:  Well, this is outside of my area of expertise, and it is not an area that I'm opining on.  However --

BY MR. ANDERSON:

Q.   You are opining that there should be more testing over the last 30 years because contact lenses have changed.  But you're not an optometrist, correct?

A.   Again, for the third time, correct.

Q.   You're not an ophthalmologist, correct?

A.   Do you want me to -- yes, correct.

Q.   You are not an expert in EPA regulations, correct?

A.   I am not.



Page 80

Q. You are not an expert in human factors, correct?

A. Nor do I represent myself to be, no.

Q. You are not a chemist, correct?

A. Correct.

Q. You're not a toxicologist, correct?

A. Correct.

Q. You have not inspected the product, correct?

A. I have not needed to, correct.

Q. And yet you're making an opinion -- and just -- it is a yes or no -- it is your opinion that additional testing should have been done over the last 30 years because contact lenses have changed?

MS. SUMMERS: Object to the form.

THE WITNESS: So that's not what I stated. But let me elaborate on that, and if you'd like to read back the record in terms of exactly what I said, I'd be happy to elaborate on it, or I can just elaborate in general.

1995 was a different time in terms of how people used their homes. There was no Airbnb, no short-term rentals. People had a home. They used their home. They used bait stations for where they lived. And from a consumer perspective, that would be where they used it for.

Things have changed in terms of contact lens


MAGNA
LEGAL SERVICES

Page 138

REPORTER'S CERTIFICATION

I, ASHLEY L. PROXMIRE, do hereby certify:

That I am a licensed Certified Shorthand Reporter, duly qualified and certified as such by the State of California.

That prior to being examined, the witness named in the foregoing deposition was duly sworn to testify under oath.

That the preceding deposition was recorded stenographically by me at the time and place herein mentioned; and that the preceding pages constitute a complete and accurate record of the testimony given by the aforementioned witness.

That I am a neutral party, in no way interested in the outcome of said action, and that I am not related to or otherwise connected with any of the parties involved with this matter or their respective counsel.

Dated: November 1, 2025

_Ashley L. Proxmire_
_____
ASHLEY L. PROXMIRE, CSR No. 13664


MAGNA
LEGAL SERVICES

**Case Name:** *Wortman v. Amazon.com*
**Case No.:** 2:24-cv-06022

## PROOF OF SERVICE

### STATE OF CALIFORNIA, COUNTY OF LOS ANGELES

I am employed in the County of Los Angeles, State of California. I am over the age of 18 and not a party to the within action. My business and e-mail addresses are 1150 So. Olive Street, 18th Floor, Los Angeles, CA 90015; hesparza@lynberg.com.

On **November 13, 2025**, I served the foregoing document(s) described as **DEFENDANTS' MOTION IN LIMINE NO. 2: TO STRIKE OR LIMIT OPINIONS AND EXPERT TESTIMONY OF ZAL PHIROZ** on the interested parties by placing a true copy thereof enclosed in sealed envelopes addressed as follows:

### SEE ATTACHED SERVICE LIST

☐ **BY MAIL**: As follows: I am "readily familiar" with the firm's practice of collection and processing correspondence for mailing. Under that practice, I deposited such envelope in the mail at Orange, California.

☒ **BY E-SERVE:** The above listed document(s) were electronically served via the USDC Central District's CM/ECF system and the Notice of Electronic Filing (NEF) indicates the registered party and/or attorney were served with the above documents.

☒ **BY ELECTRONIC MAIL:** I caused all of the pages of the above-entitled document to be sent from hesparza@lynberg.com to the recipient(s) noted at the respective email address(es) indicated.

☐ **BY FACSIMILE:** I caused all of the pages of the above-entitled document to be sent to the recipient(s) noted via facsimile at the respective telephone numbers indicated above.

☐ **BY FEDERAL EXPRESS/OVERNIGHT MAIL**: I caused the above-described document to be served on the interested parties noted as follows by Federal Express/Overnight Mail.

☐ **BY PERSONAL SERVICE**: I caused such envelope to be delivered by hand to the office(s) of the addressee via messenger.

I declare that I am employed in the office of a member of the bar of this court at whose direction the service was made.

Executed on November 13, 2025, at Los Angeles, California.

_____
HELEN ESPARZA

**Case Name:** *Wortman v. Amazon.com*
**Case No.:** 2:24-cv-06022

**SERVICE LIST**

| | |
|---|---|
| Stefano G. Formica, Esq.<br>Kellian W. Summers, Esq.<br>John H. Kalpakchian, Esq.<br>**FORMICA LAW GROUP**<br>5900 Wilshire Blvd., Suite 2250<br>Los Angeles, CA 90036 | Tel: (323) 272-3334<br>Fax: (323) 272-3926<br>Email: sformica@formicalawgroup.com<br>Email: ksummers@formicalawgroup.com<br>Email: jkalpakchian@formicalawgroup.com<br><br>Nuccio Patti, Esq.<br>nuccio@formicalawgroup.com<br>Ashley Silva<br>asilva@formicalawgroup.com<br>Marisela Salazar<br>marisela@formicalawgroup.com<br>Melissa Sierra<br>msierra@formicalawgroup.com<br>Formica Law<br>admin@formicalawgroup.com<br>Case File<br>GabrielleWortmanZ2295079@formicalawgroup.filevineapp.com<br><br>Attorneys for Plaintiff GABRIELLE WORTMAN |
| Steven K. Hwang, Esq.<br>Daniella Gutierrez, Esq.<br>**PERKINS COIE LLP**<br>1888 Century Park East, Ste 1700<br>Los Angeles, California 90067-1721 | Tel: (310) 788-9900<br>Fax: (310) 788-3399<br>Email: SKHwang@perkinscoie.com<br>Email: DaniellaGutierrez@perkinscoie.com<br><br>Bobbie Howard<br>BHoward@perkinscoie.com<br><br>Jennifer Bower<br>JBower@perkinscoie.com<br><br>Co-counsel for Defendant AMAZON.COM SERVICES LLC |

**2**

PROOF OF SERVICE
